623 So.2d 462 (1993)
STATE of Florida, Petitioner,
v.
Leon WILLIAMS, Respondent.
No. 79507.
Supreme Court of Florida.
July 1, 1993.
Rehearing Denied September 16, 1993.
*463 Robert A. Butterworth, Atty. Gen., Joan Fowler, Sr. Asst. Atty. Gen. and John Tiedemann, Asst. Atty. Gen., West Palm Beach, for petitioner.
Richard L. Jorandby, Public Defender, and Cherry Grant, Asst. Public Defender, West Palm Beach, for respondent.
Marc A. Gordon, Law Office of Gordon & Spudeas, Fort Lauderdale, amicus curiae, for Broward Ass'n of Crim. Defense Lawyers.
HARDING, Justice.
We have for review Williams v. State, 593 So.2d 1064 (Fla. 4th DCA 1992), in which the Fourth District Court of Appeal certified the following question as one of great public importance:
DOES THE SOURCE OF ILLEGAL DRUGS USED BY LAW ENFORCEMENT PERSONNEL TO CONDUCT REVERSE STINGS CONSTITUTIONALLY SHIELD THOSE WHO BECOME ILLICITLY INVOLVED WITH SUCH DRUGS FROM CRIMINAL LIABILITY?
Id. at 1064. We accept jurisdiction pursuant to article V, section 3(b)(4) of the Florida Constitution, and rephrase the question as follows:
Whether the manufacture of crack cocaine by law enforcement officials for use in a reverse-sting operation constitutes governmental misconduct which violates the due process clause of the Florida Constitution?
We answer the rephrased question in the affirmative and thus approve the decision of the district court below. We hold that the illegal manufacture of crack cocaine by law enforcement officials for use in a reverse-sting operation within 1000 feet of a school constitutes governmental misconduct which violates the due process clause of the Florida Constitution. Thus, we find that the defendant's conviction for purchasing the crack cocaine must be reversed.
On February 15, 1990, the police arrested Leon Williams (Williams) for allegedly purchasing crack cocaine within 1000 feet of a school. Williams filed a motion to dismiss the charges because of alleged police misconduct that violated his due process rights. The State and Williams entered the following stipulation of facts relevant to a hearing on Williams' motion to dismiss the charges:[1]
1. On April 21, 1988, [Detective] Mary Guess, of the Broward Sheriff's Office (B.S.O.), discovered 991.2 grams of cocaine in a Greyhound bus station locker, under case number BS88-4-10524.
2. [Detective] Guess turned this abandoned cocaine in to the B.S.O. Crime Lab where it was signed in by Sal Anzelone, an employee of the Broward Sheriff's Office.
3. The cocaine, which was in powder form, was placed into destroy case 4604X, it being the intention of B.S.O. at that time to destroy that cocaine as no arrests were made as a result of its discovery, there was no case pending regarding that cocaine, no medicinal use was contemplated for said cocaine, and no order by any court had been entered requiring or permitting any other use of said cocaine.
4. The normal procedure for the destruction of seized narcotic contraband would have been for aforementioned B.S.O. employee Sal Anzelone to sign the cocaine out of the lab, transport it to a local incinerator and have it burned there.
5. A decision was made by the B.S.O. Crime Lab technician to retain the cocaine for use in B.S.O. reverse sting operations.
6. Sometime prior to February 14, 1989, John Pennie, B.S.O. Crime Lab Supervisor, and Randy Hilliard decided it was necessary to convert the powder cocaine to "crack" cocaine. They cleared this procedure through the proper B.S.O. chain of command, and was approved by Sheriff Nick Navarro.
7. On February 14, 1989, B.S.O. chemist Randy Hilliard began cooking up "crack" cocaine in the B.S.O. lab... .

*464 8. Following the conversion procedure, B.S.O. chemist, Randy Hilliard cut the "crack" cocaine into small pieces, places [sic] the pieces into individual plastic ziplock bags, and heat-sealed the bags.
9. The individually packaged "crack" rocks were then distributed to B.S.O. deputies for reverse sting operations, by B.S.O. employee, Sal Anzelone.
10. These "crack" rocks were used in the reverse sting operation which resulted in the Defendant's arrest and prosecution in the above-styled case.
11. Powder form cocaine and "crack" form cocaine are separate and distinct chemical structures. Powder form cocaine is represented chemically as C[17] H[21] NO[4] HC[1]. "Crack" cocaine is represented chemically as C[17] H[21] NO[4].
12. B.S.O. Chemist, Randy Hilliard is not a "pharmacist" as defined in Chapter 893.02(14), Florida Statutes (1989).
13. B.S.O. Chemist, Randy Hilliard is not a "practitioner" as defined in Chapter 893.02(16), Florida Statutes (1989).
In denying Williams' motion to dismiss, the trial court found that the Broward County Sheriff's Office manufactured crack cocaine for "a bonafied [sic] and legitimate law enforcement purpose" and that the Sheriff's Office acted pursuant to section 893.13(5)(b)(5), Florida Statutes (1989), and State v. Bass, 451 So.2d 986 (Fla. 2d DCA 1984). Williams proceeded to trial and the jury convicted him of purchasing a controlled substance within 1000 feet of a secondary school. § 893.13(1)(e), Fla. Stat. (1989).
On appeal, the district court reversed Williams' conviction, citing its decision in Kelly v. State, 593 So.2d 1060 (Fla. 4th DCA), review denied, 599 So.2d 1280 (Fla. 1992). In Kelly, the district court stated:
We have reconsidered the issue of the police manufacture or reconstitution of powdered cocaine into "crack" rocks, and we find that the practice is illegal. We hold that the use by the police of such reconstituted "crack" infringed on the appellant's right to due process of law. In other words, the police agencies cannot themselves do an illegal act, albeit their intended goal may be legal and desirable.
Id. at 1061. Consequently, the district court in Kelly reversed the defendant's conviction. Following the district court's reversal in the instant case, the State filed a motion for certification which the district court granted. We accepted jurisdiction to answer the certified question.
In State v. Glosson, 462 So.2d 1082 (Fla. 1985), this Court developed its own due process analysis based on article I, section 9 of the Florida Constitution.[2] In Glosson, the State and an informant entered a contingent-fee agreement in which the informant would receive ten percent of all civil forfeitures resulting from criminal prosecutions in which the informant provided testimony and cooperation. Id. at 1083. As this Court stated:
We can imagine few situations with more potential for abuse of a defendant's due process right. The informant here had an enormous financial incentive not only to make criminal cases, but also to color his testimony or even commit perjury in pursuit of the contingent fee. The due process rights of all citizens require us to forbid criminal prosecutions based upon the testimony of vital state witnesses who have what amounts to a financial stake in criminal convictions.
Accordingly, we hold that a trial court may properly dismiss criminal charges for constitutional due process violations in cases where an informant stands to gain a contingent fee conditioned on cooperation and testimony in the criminal prosecution when that testimony is critical to a successful prosecution.
Id. at 1085. In deciding Glosson, this Court rejected the federal court's narrow application of the federal due process defense.[3]Id. *465 This Court also cited opinions from two other states for the proposition that the courts could use the due process defense to overturn criminal convictions as a check against outrageous police conduct. State v. Hohensee, 650 S.W.2d 268 (Mo. Ct. App. 1982) (reversing a predisposed defendant's conviction for burglary because the police violated state due process rights in sponsoring and operating a burglary in which the defendant acted as a lookout); People v. Isaacson, 44 N.Y.2d 511, 406 N.Y.S.2d 714, 378 N.E.2d 78 (N.Y. 1978) (reversing a predisposed defendant's conviction for drug sales because police misconduct and trickery violated state due process rights). This Court also agreed with the courts in Hohensee and Isaacson that "governmental misconduct which violates the constitutional due process right of a defendant, regardless of that defendant's predisposition, requires the dismissal of criminal charges." Glosson, 462 So.2d at 1085.
Due process of law is a summarized constitutional guarantee of respect for personal rights which are "so rooted in the traditions and conscience of our people as to be ranked as fundamental." Snyder v. Massachusetts, 291 U.S. 97, 105, 54 S.Ct. 330, 78 L.Ed. 674 (1934). Due process of law imposes upon a court the responsibility to conduct "an exercise of judgment upon the whole course of the proceedings in order to ascertain whether they offend those canons of decency and fairness which express the notions of justice." Malinski v. New York, 324 U.S. 401, 416-17, 65 S.Ct. 781, 788-89, 89 L.Ed. 1029 (1945). Defining the limits of due process is difficult because "`due process,' unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances." Joint Anti-Facist Refugee Comm. v. McGrath, 341 U.S. 123, 162, 71 S.Ct. 624, 643, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring). Rather, due process is a general principle of law that prohibits the government from obtaining convictions "brought about by methods that offend `a sense of justice.'" Rochin v. California, 342 U.S. 165, 173, 72 S.Ct. 205, 210, 96 L.Ed. 183 (1952).
This Court is also aware of the difficulties that law enforcement officials face in detecting and stopping narcotic trafficking in our state. As Justice Powell stated in Hampton v. United States, 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976):
One cannot easily exaggerate the problems confronted by law enforcement authorities in dealing effectively with an expanding narcotics traffic, which is one of the major contributing causes of escalating crime in our cities. Enforcement officials therefore must be allowed flexibility adequate to counter effectively such criminal activity.
Id., 425 U.S. at 495-96 n. 7, 96 S.Ct. at 1653 n. 7 (Powell, J., concurring in the judgment) (citations omitted). Undercover tactics and limited participation in drug rings are often the only methods law enforcement officials have to gather evidence of drug-related offenses. Law enforcement tactics such as reverse-sting operations can hardly be said to violate fundamental fairness or be shocking to the universal sense of justice. See State v. Burch, 545 So.2d 279 (Fla. 4th DCA 1989) (holding that reverse sting operations involving undercover police officers selling controlled substances within 1000 feet of a school is not outrageous conduct as a matter of law), approved, 558 So.2d 1 (Fla. 1990); see also State v. Brider, 386 So.2d 818 (Fla. 2d DCA) (holding that furnishing of a controlled substance by government agents in a reverse-sting operation did not constitute outrageous conduct to invoke due process considerations), review denied, 392 So.2d 1372 (Fla. 1980). While we must not tie law enforcement's hands in combatting crime, there are instances where law enforcement's conduct cannot be countenanced and the courts will not permit the government to invoke the judicial process to obtain a conviction. See, e.g., Glosson; Hohensee; Isaacson. As Justice Frankfurter recognized in Rochin, "[t]he Due Process Clause places upon this Court the duty of exercising a judgment, within the narrow confines of judicial power in reviewing State convictions, upon interests of society *466 pushing in opposite directions." Rochin, 342 U.S. at 171, 72 S.Ct. at 209.
Applying these principles to the facts of the instant case, we find that the law enforcement's conduct here was so outrageous as to violate Florida's due process clause.
Section 893.02(12)(a), Florida Statutes (1989), defines "manufacture" as:
the production, preparation, propagation, compounding, cultivating, growing, conversion, or processing of a controlled substance either directly or indirectly, by extraction from substances of natural origin, or independently by means of chemical synthesis, or by a combination of extraction and chemical synthesis, and includes any packaging of the substance or labeling or relabeling of its container....
The factual stipulation in the instant case shows that the chemist for the Broward County Sheriff's Office took the seized powdered cocaine and converted it into crack cocaine pursuant to the Sheriff's approval. The stipulation also shows the procedure which the chemist used in making the crack cocaine.[4] The chemist's conversion of the powdered cocaine into crack cocaine clearly meets the definition of manufacture under the statute.
Section 893.13, Florida Statutes (1989), which prohibits the sale, purchase, manufacture, delivery, or possession of a controlled substance contains two exclusions for law enforcement officials. Section 893.13(5)(b)5 excludes the "actual or constructive possession of controlled substances" by "[o]fficers or employees of state, federal, of local governments acting in their official capacity," and section 893.13(5)(c) excludes the "delivery of controlled substances by a law enforcement officer for bona fide law enforcement purposes in the course of an active criminal investigation." Section 893.13, however, does not contain a provision allowing law enforcement officials to manufacture a controlled substance. Therefore, we find that the Broward County Sheriff's Office acted illegally in manufacturing the crack cocaine it used in the reverse-sting operation which led to Williams' arrest.
The State argues that the police do not need specific statutory authority to manufacture crack cocaine for use in reverse-sting operations. The State cites Bass, 451 So.2d 986, for support of its proposition. In Bass, state law enforcement officers delivered marijuana, obtained from federal agents, to the defendants as part of a reverse-sting operation. Id. at 987. The trial court dismissed the charges of trafficking in marijuana because it concluded that the state law enforcement officers lacked statutory authority to deliver the marijuana. The Second District Court of Appeal reversed the trial court's dismissal and held that law enforcement officials did not need a specific statutory authority to engage in reverse-sting deliveries of controlled substances. Id. at 988. The district court noted that the Legislature had provided law enforcement officials with immunity from civil or criminal liability for lawfully enforcing controlled substance laws. Id. Moreover, the district court recognized that it had held in Brider, 386 So.2d 818, that delivery of a controlled substance by government agents in a reverse-sting operation did not constitute entrapment as a matter of law. Id.
We find that Bass is distinguishable from the instant case. The delivery of a controlled substance in a reverse-sting operation is worlds apart from the manufacture of a dangerous controlled substance. Thus, unlike Bass, the facts in the instant case show that the law enforcement officers' conduct in illegally manufacturing crack cocaine is so outrageous that it violates the due process clause.
Another disturbing fact in the instant case is the nature of the controlled substance manufactured by the Broward County Sheriff's Office. It is undisputed that crack cocaine is highly addictive and has caused death. The State argues that the Broward County Sheriff's Office manufactured its own crack cocaine, rather than use confiscated crack cocaine, because of fears that the confiscated *467 crack cocaine might be tainted with foreign substances. The State urges that the manufacture of crack cocaine is safer than the use of confiscated crack cocaine in a reverse-sting operation. We find that the record does not support the State's argument. The chemist who manufactured the crack cocaine for the Broward County Sheriff's Office testified that he had not found any detrimental foreign substances in the over 20,000 seized crack cocaine rocks he has examined for the sheriff's office. Further, it is incredible that law enforcement's manufacture of an inherently dangerous controlled substance, like crack cocaine, can ever be for the public safety.
Further, we are alarmed that a significant portion of the crack cocaine manufactured for use in reverse-sting operations was lost. As the district court in Kelly stated:
Even more disturbing is the fact that some of the "crack," which is made in batches of 1200 or more rocks, escapes into the community where the reverse sting operations are conducted. The police simply cannot account for all of the rocks which are made for the purpose of the reverse stings.
593 So.2d at 1062. In this case, the State conceded at oral argument that some of the crack cocaine was lost during the reverse-sting operations. This fact is particularly outrageous considering that the police conducted the reverse-sting operation within one thousand feet of a high school. This lack of strict inventory control over the crack cocaine resulted in an undetermined amount of the dangerous drug escaping into the community. We find that this is an anomalous consequence inasmuch as the Sheriff is responsible for protecting the community.
Finally, the State argues that even if the Broward County Sheriff's Office illegally manufactured crack cocaine, Williams' conviction should stand. At oral argument, the State conceded that it did not condone the Sheriff's practice of manufacturing crack cocaine for reverse-sting operations. However, the State argues that this conduct can be deterred by prosecuting those law enforcement officers involved in the manufacture of the crack cocaine, rather than overturning Williams' conviction. We find this argument without merit, especially in light of the State's concession that no law enforcement officials have been charged with illegally manufacturing crack cocaine. Moreover, the protection of due process rights requires that the courts refuse to invoke the judicial process to obtain a conviction where the facts of the case show that the methods used by law enforcement officials cannot be countenanced with a sense of justice and fairness. The illegal manufacture of crack cocaine by law enforcement officials violates this Court's sense of justice and fairness. As Justice Brandeis pointed out in Olmstead v. United States, 277 U.S. 438, 485, 48 S.Ct. 564, 575, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting):
Decency, security, and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen. In a government of laws, existence of the government will be imperiled if it fails to observe the law scrupulously. Our government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means  to declare that the government may commit crimes in order to secure the conviction of a private criminal  would bring terrible retribution. Against that pernicious doctrine this court should resolutely set its face.
Thus, the only appropriate remedy to deter this outrageous law enforcement conduct is to bar the defendant's prosecution.
Accordingly, we approve the decision of the district court below.
It is so ordered.
BARKETT, C.J., and OVERTON, SHAW, GRIMES and KOGAN, JJ., concur.
McDONALD, J., dissents.
NOTES
[1] The stipulation contains written notations indicating that the policies and procedures of the Broward Sheriff's Office in paragraphs 3, 4, and 5 are unknown. However, the stipulation is clear that the manufacture of the crack cocaine was pursuant to proper procedures and was approved by Sheriff Nick Navarro.
[2] Article I, section 9 of the Florida Constitution reads in pertinent part:

Due Process.  No person shall be deprived of life, liberty or property without due process of law... .
[3] In State v. Glosson, 462 So.2d 1082 (Fla. 1985), this Court noted that the federal courts have been reluctant to allow the federal due process defense. Indeed, as pointed out by Glosson, "a recent federal circuit court stated that nothing short of `the infliction of pain or physical or psychological coercion' will establish the due process defense." Id. at 1084 (quoting United States v. Kelly, 707 F.2d 1460, 1477 (D.C. Cir.), cert. denied, 464 U.S. 908, 104 S.Ct. 264, 78 L.Ed.2d 247 (1983)).
[4] The specific procedure used to make the crack cocaine has been deleted from the stipulation quoted in this opinion.