758 So.2d 1131 (2000)
STATE of Florida, Appellant,
v.
Mark MARKS, P.A.; Marvin Mark Marks; Gary Marks; Carl Borgan; Irene Porter; Noreen Roberts; and Denise Beloff, Appellees.
Nos. 4D98-1601, 4D98-2715.
District Court of Appeal of Florida, Fourth District.
March 29, 2000.
Rehearing Denied May 15, 2000.
*1132 Robert A. Butterworth, Attorney General, Tallahassee, and Richard L. Polin, Assistant Attorney General, Miami, for appellant.
H. Dohn Williams, Jr., P.A., Fort Lauderdale, for appellee Mark Marks, P.A.
Mark Hicks of Hicks & Anderson, P.A., Miami, for appellees Mark Marks and Gary Marks, and Irene Porter, Noreen Roberts and Denise Beloff.
Ira N. Loewy and Edward R. Shohat of Bierman, Shohat, Loewy & Klein, P.A., Miami, for appellee Carl Borgan.
FARMER, J.
The trial judge at one time assigned to this criminal case was required by our mandate to hold an adversarial hearing on whether to apply the crime-fraud exception to the attorney-client privilege to certain communications. Instead of holding an ordinary adversarial hearing with all parties involved, however, the judge engaged in extensive ex parte hearings only with the prosecutors and their investigators, after which he overruled the claim of *1133 privilege as to all the documents in question. Later a different judge assayed these extensive ex parte communications as part of a reconsideration of the orders entered by the judge participating in the ex parte hearings and concluded that certain charges against the defendants should be dismissed. On appeal the State argues that the dismissal was improper and that we should reinstate the dismissed charges. We disagree.
The events leading up to the dismissal need initially only be summarized. Originally the State filed a 32-count information in late 1989 against a law firm and its two principal attorneys, as well as nine other defendants, charging various crimes in connection with allegations of insurance fraud.[1] After this initial filing, the State continued to investigate for possible additional offenses already committed but as yet uncharged. During this continuing investigation, the State issued a subpoena requiring the production of 253 client files originating in the offices of the charged lawyers. These lawyers moved to quash the subpoena, but the trial judge then assigned to the case denied the motion.
On review of the refusal to quash the subpoena in Marks v. State, 572 So.2d 976 (Fla. 4th DCA 1990), we said:
"We grant the writ and remand with instructions to conduct an in camera hearing on the issue of attorney-client and work product privileges as asserted by petitioners. Moreover, on remand the trial court is respectfully instructed to consider and adjudicate petitioner's issues that the subpoena duces tecum exceeds the permissible bounds of discovery under Florida Rule of Criminal Procedure 3.220."
572 So.2d at 977. On return of the case to the trial court, however, another judge was newly assigned to the case and interpreted our command to determine the attorney-client privilege into a series of ex parte conferences with the prosecutors and state investigators as to why the privilege was said to be overcome by the crime-fraud exception.[2] We agree with the lower court's order on review now that it was error for this first successor judge to have proceeded to hold these extensive ex parte conferences and communications with the attorneys and investigators representing the state.[3]
In United States v. Zolin, 491 U.S. 554, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989), the Supreme Court laid down the procedure for determining when the crime-fraud exception may be used to overcome the attorney client privilege. The trial court was correct in reading Zolin to require that, before documents claimed to be covered by this privilege may be subjected to an in camera review by the judge to ascertain if the crime-fraud exception may be *1134 validly invoked, the state must make an evidentiary showing plausibly implicating the possible application of the exception. This preliminary evidentiary showing is clearly not an ex parte proceeding. See American Tobacco Co. v. State of Florida, 697 So.2d 1249, 1256 (Fla. 4th DCA 1997) (where judge seeks to weigh evidence in proceeding to determine whether to apply crime-fraud exception to attorney-client privilege, party invoking privilege has absolute right to be heard by testimony and argument); see also Haines v. Liggett Group, Inc., 975 F.2d 81 (3d Cir.1992).
Hence we agree with the trial court that, under the law clearly established when the first successor judge undertook to have these ex parte conferences, there was no plausible basis for him to have believed that he was authorized to have conferences with the prosecutors and investigators involving the substance of the case, but without notice to or participation by the defendants. See Rose v. State, 601 So.2d 1181 (Fla.1992) (judge should not engage in any conversation about pending case other than concerning strictly administrative matters with only one of parties participating in conversation); In re Inquiry Concerning a Judge: Clayton, 504 So.2d 394, 395 (Fla.1987) (canon was written with clear intent to exclude all ex parte communications except when expressly authorized by statutes or rules); Fla. Bar Code of Jud. Conduct, Canon 3 A(4) (1991) (adopted 1973, as amended to July 1994) ("A judge should accord to every person who is legally interested in a proceeding, or his lawyer, full right to be heard according to law, and except as authorized by law, neither initiate nor consider ex parte or other communications concerning a pending or impending proceeding.").[4]
After the disqualification of the first successor judge, the defendants moved for a reconsideration of his orders respecting the assertion of the privilege.[5] The trial judge now assigned to the case requested answers from both sides as to ten specific inquiries about the communications, and each filed lengthy written submissions. Later the trial judge made ten new inquiries of the parties, and again they made written submissions to the court. Ultimately the judge held a hearing on the matter and heard extensive argument from all concerned.
In his order that we review today, the judge enumerated 17 ex parte communications between the first successor trial judge and the prosecutors and investigators that were improper. Most of them plainly involved substantiverather than merely purely ministerial administrative matters. He also found that the state had "moved as quickly as possible" to inhibit defendants from responding to the improper communications. He specifically found that:
"the ex parte communications between the State and [the first successor judge] were overwhelmingly substantial and so egregious that the Defendants' due process rights were irretrievably compromised." [emphasis supplied]
He added that:
"the effect of the combined conduct of the State and [the first successor judge] has created a situation in which this court cannot `unring the bell.' For many years, the State has been in possession of all the documents in question, *1135 while the Defendants' fundamental due process rights have been abridged. Therefore, the ... Ex Parte Order entered by [the first successor judge] can no longer stand."
The judge thereupon dismissed the charges of insurance fraud but permitted the perjury counts to remain.
The state argues that the disqualification of the judge involved in the improper communications and the exclusion at trial of any evidence obtained thereby is a sufficient remedy for the due process violation and that dismissal of the insurance fraud charges is entirely inappropriate. In context we view the state's position to amount to an argument that the court has abused its discretion in the dismissal. We disagree.
Initially we note that governmental misconduct violating a defendant's constitutional right to due process of law can, under some circumstances, authorize the trial judge to dismiss criminal charges. State v. Williams, 623 So.2d 462, 465 (Fla. 1993); Krajewski v. State, 587 So.2d 1175, 1181 (Fla. 4th DCA 1991), reversed on other grounds, 589 So.2d 254 (Fla.1991); see also, McDonald v. State, 742 So.2d 830 (Fla. 4th DCA 1999) (trial court should grant motion to dismiss Information when police conduct is so egregious as to violate defendant's due process rights). In State v. Glosson, 462 So.2d 1082 (Fla.1985), the court explained:
"Due process of law is a summarized constitutional guarantee of respect for personal rights which are `so rooted in the traditions and conscience of our people as to be ranked as fundamental.' Snyder v. Massachusetts, 291 U.S. 97, 105, 54 S.Ct. 330, 78 L.Ed. 674 (1934). Due process of law imposes upon a court the responsibility to conduct `an exercise of judgment upon the whole course of the proceedings in order to ascertain whether they offend those canons of decency and fairness which express the notions of justice.' Malinski v. New York, 324 U.S. 401, 416-17, 65 S.Ct. 781, 89 L.Ed. 1029 (1945). Defining the limits of due process is difficult because `due process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances.' Joint Anti-Fascist Refugee Comm. v. McGrath, 341 U.S. 123, 162, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring). Rather, due process is a general principle of law that prohibits the government from obtaining convictions `brought about by methods that offend a sense of justice.' Rochin v. California, 342 U.S. 165, 173, 72 S.Ct. 205, 96 L.Ed. 183 (1952)."
623 So.2d at 465. As a broad proposition, we discern ample authority from the foregoing to dismiss a criminal prosecution where the state or its officials have engaged in conduct that operates in a significant way to deny a defendant due process of law. The real question is whether the facts and circumstances support the trial court's dismissal rather than some lesser sanction.
To be sure, there is substantial competent evidence in the record to support the conclusion that essential due process rights of the defendants have been severely compromised by the improper conduct. To understand why this is so, it is necessary to appreciate the nature of the case that the State was seeking to make in this criminal prosecution. The Marks firm engages in the practice of personal injury law. A significant aspect of this practice involves dealing with insurance companies as the ultimate payor of many personal injury claims. For some claims, the fact of injury, the causal relationship and the extent of any injury resulting from the alleged negligence are not free from controversy. The issues may turn on conflicting opinions of medical expert witnesses, not to mention divergences among nonexpert eye witnesses as to the incident alleged to have caused injury.
It is customary to attempt settlement of personal injury claims before any suit is *1136 actually filed in court. Whether before or after suit is filed, attempts at settlement often involve extensive communications between claimant's counsel and the insurer providing coverage. These settlement communications are a dance of nuance and strategy, of cajolery and intimidation, of exaggeration and minimization. Counsel for the claimant is at once bound by the attorney's tradition of zeal for the client's cause, yet also by the constraints of the profession, including the prohibition against misrepresentation. Moreover the attorney's code binds counsel to preserve "inviolate" confidential communications of a client, and requires the lawyer to stay within the bounds of the law. Clearly in settlement discussions between a claimant and the insurer where the parties are dealing at arm's length, counsel need not disclose information directly contrary to the client's position, so long as the nondisclosure does not have the effect of affirmatively misrepresenting a material fact.
It is thus possible to advocate a very close case, one where the issue of negligence is cloudy or injuries are not indisputably related to the injury, yet not misrepresent anything to the insurer. In this circumstance, counsel can lawfully seek to advocate the client's position to achieve the maximum recovery available. Again we stress, counsel cannot commit a fraud on the insurer by misrepresenting facts counsel knows to be untrue. The problem is locating the demarcation between acceptable advocacya tolerable adversarial, hyperbolic presentation of inferences, implications and conclusions about symptoms, causes and effectsand unacceptable fraud by outright lying. The point at which advocacy passes from the one to the other may well be exceedingly beclouded in a given case, as where the facts point in both directions.
We ourselves hinted at these prosecutorial difficulties on earlier review in this very case:
"Attorneys are guided by numerous different rules, laws, and cases dealing with the atypical obligations of an attorney in an advocate role. Attorneys and their clients enjoy a confidential relationship, which includes constraints upon information that can be disclosed to others. See § 90.502, Fla. Stat. (1993); R. Regulating Fla. Bar 4-1.6. Once a suit is initiated, rules of discovery provide for an exchange of information between adversaries. Even then, some items do not have to be disclosed to an adversary absent special findings by a trial court. Fla.R.Civ.P. 1.280(b). Specifically, the identities and/or opinions of a non-witness work product expert are not discoverable absent a showing of exceptional circumstances under rule 1.280(b)(4)(B). Myron v. Doctors Gen., Ltd., 573 So.2d 34 (Fla. 4th DCA 1990). Medical reports based on an examination requested by a party do not need to be delivered absent a request for such. Fla. R.Civ.P. 1.360(b); Smiles v. Young, 271 So.2d 798 (Fla. 3d DCA), cert. denied, 279 So.2d 305 (Fla.1973). In personal injury protection claims, a party must turn over all medical records concerning a specific condition only after requesting and receiving a copy of medical reports from a medical examination requested by the insurer. § 627.736(7)(b), Fla. Stat. (1993). Finally, the confidentiality of medical records is statutorily protected from disclosure in most circumstances until a proper subpoena has been issued. See, e.g., § 455.241(2), Fla. Stat. (1993)."
State v. Mark Marks, P.A., 654 So.2d 1184, 1187 (Fla. 4th DCA 1995). In that decision we held the statute under which the state was proceeding against these defendants was too vague as regards certain of the insurance fraud charges.
Our decision was affirmed by the supreme court, which also said as regards the preceding explanation of the personal injury attorney's role:
"Guided by sources such as these, instructors of legal education courses have indicated that less than complete disclosure in some contexts, including settlement *1137 negotiations, is acceptable. We cannot conclude that practicing attorneys would reach a different conclusion. Because less than complete disclosure by an attorney in the representation of his or her client is considered acceptable practice in certain instances and because section 817.234(1), does not indicate, in terms that a person of common intelligence would understand, in what instances less than complete disclosure by an attorney becomes a criminal offense, we conclude that the statute does not provide adequate notice of the conduct by attorneys that it proscribes."
State v. Mark Marks, P.A., 698 So.2d 533, 538 (Fla.1997).
The effect of our decision, as approved by the supreme court, was to dismiss some of the insurance fraud charges, leaving others still pending. In the remaining insurance fraud charges, the trial burden on the state would be to make it clear beyond any reasonable doubt that in specific personal injury claims counsel and their associates had crossed a very murky divide. The issues would turn on obscure and meticulous distinctions.
The problem with the subpoenaed files as to which the disqualified judge had overruled the attorney-client privilege is thus placed in the perspective of this successor trial judge. He had found the due process violation "egregious". The judge was now required to assess the extent of the remedy as a consequence of the particular nature of the violation. From the significant substantive ex parte communications, the disqualified trial judge had issued a blanket rejection of the attorney-client privilege for all 253 files involved. Thus the state prosecutors and their investigators had been allowed to have unfettered access to extensive confidential thoughts and unguarded statements of the lawyers in a wide array of files. They had documents as private as dictation summaries, interview notes, and legal analyses revealing their innermost thought processes on how to advocate their client's positions.
In the end, it is apparent that this very able and senior judge found all this too far reaching to erase its effects. The state prosecutors and their investigators had the benefit of prolonged, uninterrupted study of these documents for more than sufficient time to comb them for material usable in preparing the state's trial witnesses and in cross examining the defendants'. It is obvious that the trial judge found it impossible to discern all the little ways in which, because of the unique role of lawyers in advocating these claims, this improperly gotten knowledge would give the state's lawyers a markedly unfair advantage in any trial on the charges of insurance fraud. As he succinctly put it, "this court cannot unring the bell." We construe that to represent a specific conclusion by the trial judge that there is nothing the court can now do that would be reasonably likely to cure the due process violation, short of dismissing the insurance fraud charges.[6] We are simply unable to say that the judge erred in this conclusion.
Finally we confront the dismissal of the RICO charges against defendant Borgan. In granting Borgan's motion for dismissal, the trial court explained as follows:
"In order to charge a defendant with a violation of the Florida RICO Act, the State must demonstrate that the defendant engaged in "a pattern of racketeering activity." Fla. Stat. § 895.03(3)(1994). The `pattern of racketeering activity' must consist of
at least two incidents of racketeering conduct that have the same or similar intents, results, accomplices, victims, *1138 or methods of commission or that otherwise are interrelated by distinguishing characteristics and are not isolated incidents, provided that at least one of such incidents occurred after the effective date of this act and that the last of such incidents occurred within 5 years after a prior incident of racketeering conduct. [emphasis supplied]
Fla. Stat. § 895.02(4)(1994). In the case at bar, the State contends that at least four instances of perjury occurred during a single deposition. Even if all of the alleged perjurious statements were relevant, they would not meet the standard articulated in the subject statute. To wit:
the Florida definition of `pattern of racketeering activity' refers to engaging in at least two `incidents' of racketeering conduct rather than "acts" of racketeering conduct as set forth in the federal act. Thus, ... crimes committed at the same time cannot qualify as separate incidents for purposes of proving racketeering conduct under the Florida act.

State v. Lucas, 600 So.2d 1093, 1095-6 (Fla.1992). The subject deposition qualifies as one incident, although the alleged perjuries therein might qualify as acts. Absent a second incident of racketeering conduct, insufficient predicate exists for the alleged pattern here." [e.o.]
Under the same analysis, the trial judge found that Count II was similarly defective. Again, he reasoned that the state had alleged that the necessary predicate acts arose from only a single incident. Therefore, because Borgan could not conspire to violate the RICO Act unless he engaged in at least two predicate incidents, the charge of conspiracy was also defective.
The trial court's analysis on this issue is supported by the record and by the law he cited. Moreover, while the state proffered evidence that the perjury in the Drinks case was not isolated, but was instead part of the routine business practices of the Marks firm, the Information filed by the state refers only to the Drinks deposition and does not allege any others incidents of perjury. The charges against Borgan were dismissed without prejudice, and thus the state was free to amend to include other incidents, but it has not done so.
AFFIRMED.
STEVENSON and HAZOURI, JJ., concur.
NOTES
[1] This original Information was amended eight months after the initial filing. The amended 35-count Information was now directed against eight of the original 12 defendants, including the two lawyers and their firm, several employees of the firm, and one physician. The pleading charged one count of racketeering; one count of conspiracy to engage in racketeering; one count of scheme to defraud; ten counts of perjury; six counts of grand theft; and seven counts of insurance fraud. Still later, the State filed an entirely separate information presenting 11 additional counts against the two lawyers and their firm and against the physician. It is sufficient to describe all these criminal charges as centering on allegations of insurance fraud against a personal injury law firm and associated defendants.
[2] The "crime-fraud" exception to the attorney-client privilege is simply a shorthand expression recognizing that the privilege may not be used to protect communications with a lawyer for the purpose of receiving advice for the commission of a future criminal fraud. See United States v. Zolin, 491 U.S. 554, 565, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989).
[3] The first successor judge to whom we refer was later disqualified by an order of this court. Marks v. Ferris, No. 93-867 (Fla. 4th DCA June 22, 1993). The case was then assigned to another judge. The judge whose order we review in this appeal is not the judge who engaged in the improper ex parte conferences.
[4] The judicial canon forbidding ex parte communications has since been substantially rewritten. See now Fla. Bar Code of Jud. Conduct, Canon 3 B(7) (1995).
[5] See § 38.07 Fla. Stat. (1999) (upon assignment of successor judge after disqualification of original judge, party may move to vacate orders entered prior to disqualification, which shall be "granted as a matter of right"); and Fla.R.Jud.Admin. 2.160 ("Prior factual or legal rulings by a disqualified judge may be reconsidered and vacated or amended by a successor judge based upon a motion for reconsideration, which must be filed within 20 days of the order of disqualification, unless good cause is shown for a delay in moving for reconsideration or other grounds for reconsideration exist.").
[6] We also conclude that although defendants Roberts, Porter and Beloff, who were employees of the Marks firm, did not have direct standing to assert the attorney-client privilege, they are as much adversely affected by the due process violation as are the attorneys of the firm. We therefore affirm the dismissal of the insurance fraud charges against them too.